## Wytheville.

### ARMINIUS CHEMICAL COMPANY, INCORPORATED, v. WHITE'S ADMINISTRATRIX.

#### June 8, 1911.

1. PLEADING—*Misdescription of Defendant—Amendment.*—Where a corporation defendant is misdescribed in the writ and declaration simply by the omission of the word "incorporated," and there is no other corporation of the name stated, the plaintiff should be permitted to insert the omitted word in the proper place in his declaration, and a plea setting up the misdescription should be rejected.

2. PROCESS—*Returnable Within Ninety Days—Case at Bar.*—A writ issued November 25, 1908, returnable to the third Monday in January, sufficiently appears to be returnable within ninety days from its date. The omission of the word "next" after January was immaterial.

3. PLEADING—*Declaration—Sufficiency.*—If a count in a declaration sets forth such material facts as would entitle the plaintiff to recover if the facts pleaded are proved, the count is good though more elaborate than needful, and containing much surplusage.

4. WITNESSES — *Proof — Prior Inconsistent Statements — Effect.*— Proof of the prior inconsistent statements of a witness are not substantive evidence of the facts so stated. The only effect of such proof is to counteract the effect of the present testimony of the witness.

5. MASTER AND SERVANT—*Safe Appliances—Competent Servants—Case at Bar.*—The evidence in the case at bar fails to show that the machinery furnished by the master to his servant was not reasonably safe, or that the master was negligent in the selection or retention of a competent servant to operate it.

Error to a judgment of the Circuit Court of Louisa county in an action of trespass on the case.

*Reversed.*

The following instructions were given or refused, respectively, as indicated below:

### PLAINTIFF'S INSTRUCTION NO. 1—GIVEN.

"If the jury believe from the evidence that after the notices were posted by the defendant at different times, with respect to its employees using the skips, to be carried to and from within the mine at their own risk, the defendant did not refuse, but continued as before such notices were posted, to so carry its employees, including the plaintiff's intestate, in such skips, then such notices, so far as relied on by the defendant as a defense to relieve it from liability in this suit for its negligence, if any such there be, do not constitute such a defense."

### PLAINTIFF'S INSTRUCTION NO. 2—GIVEN.

"That, when the plaintiff's intestate entered the service of the defendant, the law presumes that he contracted with reference to the dangers and hazards incident to the business of the employment as the defendant conducted it at the time he entered it, and that the compensation was adjusted accordingly; and

"The plaintiff's intestate, while engaged in the service of the defendant, in the absence of any notice, or warning to the contrary, or the same being obvious to him, or discoverable by reasonable care and observation on his part, was warranted by law in presuming that such dangers and hazards had not been increased in any way, and in determining what was reasonable care and observation on the part of the plaintiff's intestate, the jury must take into consideration that the servant is not under the same obligation as the master to know the nature and extent of the dangers and hazards which may exist, unless they are obvious to him."

### PLAINTIFF'S INSTRUCTION NO. 3—GIVEN.

"That it was the duty of the defendant to use ordinary and all reasonable care to provide hoisting machinery reason-

ably safe and suitable for use to which it was put by the defendant, and also to use ordinary and all reasonable care, skill and supervision, forethought and inspection to discover and repair defects, if any therein; and,

"If the jury believe from the evidence that the new hoisting machinery provided by the defendant as used by it before the death of the plaintiff's intestate was more dangerous and hazardous to his safety than the hoisting machinery which was provided and as used by the defendant at the time of the employment of the plaintiff's intestate, that this was, before the day plaintiff's intestate was killed, known to the defendant, or would have been known to it by the supervision, forethought and inspection, before the death of the plaintiff's intestate, but was unknown to the latter, and was not obvious to and could not have been discovered by the latter by the use of ordinary and all reasonable care and observation on his part, that the defendant did not give any warning or notice to the plaintiff's intestate that there was any such increase of danger or hazard to his safety, that the fall of the south skip and the sudden stop and jar of same threw the plaintiff's intestate off therefrom and caused his death, and that this fall, sudden stop, and jar of such skip occurred by reason of such increase of danger and hazard, the jury must find for the plaintiff and assess her damages as provided in instruction No. 7 below."

PLAINTIFF'S INSTRUCTION NO. 4—GIVEN.

"That it was the duty of the defendant to use ordinary and all reasonable care to make and give proper regulations and orders to its hoistmen in doing their work, and to see that such orders and regulations were obeyed and carried out by them; and,

"If the jury believe from the evidence that to use the hand levers to control the brakes on the new hoisting

machinery, for the purpose of holding the skip in the shaft with the plaintiff's intestate thereon, and for the purpose of stopping the skip when in motion going rapidly down the shaft, was practically the same means as those used with the old hoisting machinery for such purposes when the employment of the plaintiff's intestate began, and that the use of the compressed air for such purposes by such hoistman as the defendant intended to provide was more hazardous and dangerous to the safety of the plaintiff's intestate than the use of the said hand levers therefor, that this was known to the defendant, or would have been discovered by it, before the day plaintiff's intestate was killed, had it used ordinary and all reasonable care and skill in supervision, forethought and inspection of said new hoisting machinery and of its operation, but that the defendant gave no notice or warning of any increased danger or hazard to the plaintiff's intestate, and that same was unknown to the latter, not obvious to him, and could not have been discovered by him by the use of ordinary and all reasonable care and observation on his part, then it was the duty of the defendant to have used said care and give some proper order or regulation to its hoistman, operating said machinery at the time plaintiff's intestate was killed, to use said hand lever for said purposes, and not to rely entirely on the compressed air, when handling men, and to have seen that such order or regulation was obeyed and carried out by the hoistman; and,

"If the jury believe from the evidence that the defendant neglected to discharge such duty, that the compressed air was so used by said hoistman for said purposes, that it was due to the failure of the defendant to make and give such order or regulation and to see that same was obeyed and carried out by said hoistman, that the compressed air was used for said purposes, and that by reason thereof the plaintiff's intestate was killed, the jury must find for the plain-

tiff, and assess her damages as provided in instruction No. 7 below."

### PLAINTIFF'S INSTRUCTION NO. 5—GIVEN.

"That it was the duty of the defendant to use ordinary and all reasonable care to see that its hoistmen were reasonably careful in doing their work; and,

"If the jury believe from the evidence that to use the hand levers to control the brakes on the new hoisting machinery for the purpose of holding the skip in the shaft with the plaintiff's intestate thereon, and for the purpose of stopping such skip when in motion going rapidly down the shaft, was practically the same means as those used with the hoisting machinery for such purposes when the employment of the plaintiff's intestate began, that to use the compressed air for such purposes by such a hoistman as the defendant intended to provide, and did provide, was more hazardous and dangerous to the safety of the plaintiff's intestate than the use of said hand levers therefor, that this was known to the defendant, or would have been discovered by it, before the day the plaintiff's intestate was killed, and if it had used ordinary and all reasonable care and skill in supervision, forethought, and inspection of said machinery and of its operation, but that the defendant gave no notice or warning of any increased danger or hazard to the plaintiff's intestate, and that the same was unknown to the latter, not obvious to him, and could not have been discovered by him by the use of ordinary and all reasonable care and observation on his part, that the hoistman provided by the defendant, who was operating said machinery at the time plaintiff's intestate was killed, used compressed air for said purposes, that it was due to such use, instead of the hand levers being used therefor, that the plaintiff's intestate was killed, and that such hoistman before that day for a considerable time had habitually used the compressed air for

such purposes, and had habitually not used the said hand levers for such purposes, in handling men, that this was known to the defendant, or could have been discovered by it, before the day plaintiff's intestate was killed, had it used ordinary and all reasonable care in supervision of such hoistman, and that such hoistman was not discharged, nor any effort made by the defendant to prevent such failure to use such hand levers, and such hoistman was continued in his employment until the plaintiff's intestate was killed, the jury must find for the plaintiff, and assess her damages as provided in instruction No. 7 below."

### PLAINTIFF'S INSTRUCTION NO. 6—GIVEN.

"That it was the duty of the defendant to use ordinary and all reasonable care to provide a hoistman sufficiently experienced in the use of the methods furnished by the new hoisting machinery for controlling the brakes, and in fit condition physically and mentally to operate such machinery with reasonable care and skill, having regard to the safety of the other employees of the defendant, including the plaintiff's intestate, and also to use such care to inform itself, by supervision and superintendence, up to the time plaintiff's intestate was killed, whether the hoistman, who was operating such machinery at the time, was thus sufficiently experienced, and was also in such fit condition to so operate such machinery; and,

"If the jury believe from the evidence that the hoistman provided by the defendant, who was operating said machinery at the time plaintiff's intestate was killed, was not, at such time, sufficiently experienced in using compressed air, or, if sufficiently experienced, was not in a fit condition physically, or mentally, by reason of his being sick with the pleurisy, to operate said machinery with reasonable care and skill, having regard to the safety of the other employees of the defendant, including

the plaintiff's intestate, that the defendant knew, or could have discovered before the day plaintiff's intestate was killed, such lack of experience on the part of such hoistman, or, sufficiently long before the plaintiff's intestate was killed for the hoistman to have been put off duty before he was killed, so knew or could have discovered such unfit condition, physically or mentally, of such hoistman, by the use of ordinary and all reasonable care by the defendant to inform itself on these subjects; and,

"If the jury believe from the evidence that the loss of control of the skip and its subsequent stopping with a sudden and violent jar threw the plaintiff's intestate off down the shaft and killed him, and that such loss of control of the skip, and such subsequent stopping and violent jar of the skip, was due to said lack of sufficient experience by said hoistman in the use of compressed air, or to his not being in said fit condition, physically or mentally, by reason of his being sick of the pleurisy, or to either of these things, the jury must find for the plaintiff and assess her damages as provided in instruction No. 7 below."

### PLAINTIFF'S INSTRUCTION NO. 7—GIVEN.

"If you find for the plaintiff, in ascertaining the amount of damages, you should assess same with reference:

"First: To the pecuniary loss sustained by the widow and the two children of Richard S. White, by reason of his death, fixing the same at such sum as would be equal to the probable earnings of the deceased, taking into consideration his age, business capacity, experience, health, habits, energy and perseverance, during what would probably have been his lifetime if he had not been killed.

"Second: By adding thereto compensation for the loss of his care, attention and society to his widow and children.

"Third: By adding such further sum as you may deem fair and just by way of solace and comfort to his widow and

children for the sorrow, suffering and mental anguish occa-
sioned them by his death—the entire damages in such case
not to exceed the sum of ten thousand dollars."

### DEFENDANT'S INSTRUCTION NO. 1—GIVEN.

"The court instructs the jury that the negligence of the
defendant in this case cannot be inferred from the mere
happening of the accident by which the decedent, White, lost
his life. That fact does not raise even a *prima facie* pre-
sumption that the defendant was guilty of negligence or a
breach of duty to White.

"Negligence of the defendant is an affirmative fact, to be
established by preponderating proof. The party who
affirms negligence must establish it by proof sufficient to
satisfy reasonable and well-balanced minds. The evidence
must show more than the probability of a negligent act or
else, there can be no recovery. An inference cannot be
drawn from a presumption, but must be founded upon some
fact legally established."

### DEFENDANT'S INSTRUCTION NO. 2—GIVEN.

"The court instructs the jury that all employees serving
a common master, drawing authority and compensation
from the same source, although working in different grades
and departments, are fellow servants, and assume the risk
of each other's negligence."

### DEFENDANT'S INSTRUCTION NO. 3—GIVEN.

"The court instructs the jury that under the evidence in
this case, the hoistman, Schmitz, and the plaintiff's intestate
were fellow servants, and if the jury believe from the evi-
dence that the injury was caused by the careless manner in
which Schmitz operated the machinery, and that said care-
lessness on his part was not due to incompetency or unfit-
ness or had not been habitual during the period after the
33

installation of the new machinery up to the death of the plaintiff's intestate, then the jury must find for the defendant."

### DEFENDANT'S INSTRUCTION NO. 4—GIVEN.

"The court instructs the jury that the defendant was not required in law to guarantee the absolute competency and fitness of its hoistman, Schmitz. It was only reqired to exercise ordinary care—that is, such care as a man of ordinary prudence would exercise under like circumstances—in the selection and retention of Schmitz as hoistman. And if the jury believe that the defendant did exercise such care in the selection and retention of Schmitz as a hoistman, then the defendant would not be responsible for the death of the plaintiff's intestate, White, if it was caused by Schmitz's incompetency or unfitness, and the jury should find for the defendant."

### DEFENDANT'S INSTRUCTION NO. 5—GIVEN.

"The court instructs the jury that although they may believe from the evidence that at the time of the accident Schmitz was nervous and was suffering from pleurisy, and that the injury to White was due to these causes, still the defendant would not be responsible for White's death, unless it knew, or ought to have known, prior to the accident, of Schmitz's condition, and did not likewise know, before the accident, that this condition rendered him unfit and incompetent to operate the hoist."

### DEFENDANT'S INSTRUCTION NO. 6—GIVEN.

"The court instructs the jury that the happening of the accident by which the plaintiff's intestate, White, lost his life cannot be considered by the jury as evidence tending to show that the defendant knew, or should have known, of Schmitz's condition, or of his incompetency, if such incompetency existed. The burden is upon the plaintiff to show

that Schmitz, the hoistman, was incompetent and unfit, and likewise to show that the accident was caused by his incompetency or unfitness, and that the defendant knew or should have known of the alleged incompetency or unfitness prior to the time the accident occurred."

### DEFENDANT'S INSTRUCTION NO. 7—GIVEN.

"The court instructs the jury that the fact that the defendant, after the accident, may have adopted a different method for holding the skip in place, cannot be considered by the jury as evidence tending to show that the method adopted by the defendant prior to the accident was a negligent method."

### DEFENDANT'S INSTRUCTION NO. 8 AS MODIFIED BY THE COURT.

"The court instructs the jury that it was the duty of Mr. White to protect himself as far as he could, and take the safest place on the skip which the circumstances would admit, and that if he failed to do this, but took the more dangerous position, and that but for such position he would not have been thrown from the skip, then he was guilty of contributory negligence which proximately caused his death, and his administratrix cannot recover in this action, notwithstanding the fact that you may believe from the evidence that the defendant was guilty of negligence but for which the accident would not have occurred, *unless the jury shall believe from the evidence that the position taken on the skip by the plaintiff's intestate was his customary position, and that the defendant before said intestate's death had been accustomed to allow its employees to be carried in such position on its skip, in which case this paragraph of these instructions will not bar you from finding a verdict for the plaintiff."*

(Underscored part being court's modification; such underscoring, however, not being there when given the jury.)

### DEFENDANT'S INSTRUCTION NO. 9—GIVEN.

"The court instructs the jury that the defendant is not liable in this case, unless it had notice, either actual or constructive, of the unfit condition of Schmitz, if you shall believe from the evidence that he was unfit. Actual notice means knowledge of the fact that he was too ill to be safely intrusted with the work, and that to allow him to work would likely result in the death or injury of some third person.

"Constructive notice is that which the law imputes to the defendant from negligent ignorance; that is, its failure to observe some fact or facts which a person of ordinary prudence and forethought in a like situation would have seen and acted upon. In order to charge the defendant with negligence for failing to observe the symptoms of disease in evidence, it is essential that the plaintiff show that such symptoms did actually exist; that is, that the symptoms described in the evidence were exhibited and manifested by Schmitz, and this must be shown by affirmative evidence and cannot be left to conjecture or presumption."

### DEFENDANT'S INSTRUCTION NO. 10—GIVEN.

"The court instructs the jury that an employee assumes all risks from causes which are known to him, or which he could discover by the exercise of ordinary care, including the risks from the method of doing the work used by his employer. And even if there was a safer and better way to do it, if the danger was known to the plaintiff's intestate, or could have been known by him by the exercise of ordinary care, the jury must find for the defendant."

### DEFENDANT'S INSTRUCTION NO. 11—GIVEN.

"The court instructs the jury that, no matter how dangerous the work in which a servant may be engaged, the duty imposed by law on the employer is to exercise ordinary

care for the employee's safety. And by ordinary care is meant such care as a man of ordinary prudence would exercise under like circumstances; and if the jury believe from the evidence that the defendant company exercised ordinary care to provide for the safety of the decedent, White, then the defendant company would not be responsible for his death, and the jury must find for the defendant."

### DEFENDANT'S INSTRUCTION NO. 12—GIVEN.

"The court instructs the jury that the defendant company was not an insurer of the safety of the decedent, White, and was not required in law to adopt the safest and best means of providing for his safety. The law required the defendant company to use such means for providing for the safety of the decedent, White, as are generally employed by reasonably prudent persons engaged in the same kind of work under like circumstances; and if the jury believes from the evidence that the defendant company used such means for keeping its mine safe as are generally used by reasonably prudent persons in the same kind of work, under like circumstances, then the company would not be responsible for the decedent's death, and the jury must find for the defendant."

### DEFENDANT'S INSTRUCTION NO. 13—GIVEN.

"The court instructs the jury that it is not negligence to fail to take a precautionary measure to prevent an injury, which, if taken, would have prevented it, when the injury could not reasonably have been foreseen; and if the jury believe from the evidence that the defendant company, taking into consideration the conditions as they existed at the time of the happening of the accident, could not reasonably have foreseen that such an accident was likely to occur, then it was not negligence on the part of the defendant in not taking precautionary measures, which, if taken, would have prevented the injury, and the jury must find for the defendant."

### DEFENDANT'S INSTRUCTION NO. 14—GIVEN.

"The court instructs the jury that an employee who knows the unsafe condition of the place in which he is working is not compelled to continue the work, but, if he does continue it, he assumes the risk, not only of those dangers ordinarily incident to the work, but also dangers as become known to him during the progress of the work, or which were readily discernible by a person of his age and experience in the exercise of ordinary care; and if the jury believe from the evidence that the decedent, White, knew of the danger of riding on the skip, or ought to have known of it, and continued in the work, then he assumed the risk of injury, and the jury must find for the defendant."

### DEFENDANT'S INSTRUCTION NO. 15—GIVEN.

"The court instructs the jury that it is their duty to try this case without being influenced by sympathy, or the mere fact that the injury to White resulted in his death, and the jury must disregard all questions of the relative financial conditions of the parties, as the jury, as well as the court, are under the solemn obligation of an oath to decide according to the law and the facts, and without negligence by the defendant as the proximate cause of White's death, the defendant cannot be held pecuniarily liable."

### DEFENDANT'S INSTRUCTION NO. 16—GIVEN.

"The court instructs the jury that it is the duty of the employer to use ordinary care to provide and maintain in a reasonably safe condition the place where the employee has to work; but the employer is not an insurer of the employee, not a guarantor of his surroundings. The employer is not liable for the consequence of danger, but only for the direct consequence of negligence."

### DEFENDANT'S INSTRUCTION NO. 17—GIVEN.

"The court instructs the jury that the employer is required to anticipate and guard against consequences injurious to his employee that may be reasonably expected to occur, but it is not compelled to foresee and provide against that which reasonable and prudent men would not expect to happen."

### DEFENDANT'S INSTRUCTION NO. 18—GIVEN.

"The court instructs the jury that the presumption is that the machine used by the defendant was reasonably safe for the purpose for which it was used; and if the jury believe that there is in this case no evidence that the machine was not so, you cannot find for the plaintiff upon an alleged defect in the machine."

### DEFENDANT'S INSTRUCTION NO. 19—REFUSED.

"The court instructs the jury that if you shall believe from the evidence that said hoistman sometimes operated said skips in a negligent and careless way, but that the plaintiff's intestate either knew, or could by reasonable diligence have known, of such habits, and made no complaint thereof to defendant's agents in charge, he assumed the risk of such negligent handling of the skip, if afterwards injured thereby."

### DEFENDANT'S INSTRUCTION NO. 20—REFUSED.

"The court instructs the jury that if you shall believe from the evidence that the skip descended the shaft with great rapidity from the point of starting therein, and this result could not have been accomplished except by throwing the brake left of center, then you are instructed that the proximate cause of the accident was not the leaking of the air brake; and if you so believe you will disregard the 1st, 2nd, 3rd, 4th and 5th counts of the plaintiff's declaration, and

consider only the fitness or unfitness of the hoistman involved in the 6th count."

### DEFENDANT'S INSTRUCTION NO. 21—REFUSED.

"The court instructs the jury that under the 1st, 2nd, 3rd, 4th and 5th counts of the plaintiff's declaration the burden is on her to show : (1) That the air brake was defective; (2) that such defective condition was the proximate cause of the accident. If, therefore, it appears from the evidence that the descent of the skip may have been due to the leakage of the air on the brake, or if it, on the other hand, may have been occasioned by the inadvertent act of the hoistman in throwing the lever left of center, and you further believe that either of these theories are reasonably probable from the evidence, then you will disregard all of said counts and consider only the 6th count of said declaration involving the unfit condition of said hoistman."

### DEFENDANT'S INSTRUCTION NO. 22—REFUSED.

"The court instructs the jury that where a person is confronted with two ways of doing his work, one safe and the other dangerous, it is his duty to adopt the safer course, irrespective of the degree of danger which may be in the unsafe course."

"And if the jury believe from the evidence that it was known to White that a ladder was provided for the men to go in and out of the mine, and that it was safer to use the ladder than to ride on the edge of the skip, then the decedent, White, was guilty of contributory negligence in not using the ladder, and the jury must find for the defendant."

### DEFENDANT'S INSTRUCTION NO. 23—REFUSED.

"The court instructs the jury that it does not relieve the decedent, White, from the duty of adopting the safer way

to get out of the mines, by showing that other employees also adopted a dangerous way of coming out of the mine, when they could have adopted a safer way."

DEFENDANT'S INSTRUCTION NO. 24—REFUSED.

"The court instructs the jury that if they shall believe from the evidence that there was a notice posted in the shaft-house of the mine before the accident occurred, notifying the men that if they rode the skips in and out of the mine that they would do so at their own risk, but not forbidding them to do so, and that the defendant had no interest in their mode of ingress and egress, that there was and is a ladder in said mine furnishing a safer, but more laborious method of going in and coming out of such mine, then Mr. White assumed the risk of riding such skip, as such notice was sufficient to advise him of the danger thereof, though he did not know or appreciate the method or manner in which the brakes were operated on the engine.

*P. H. C. Cabell* and *Gordon & Gordon,* for the plaintiff in error.

*F. W. Sims,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

White's administratrix brought suit against the Arminius Chemical Company, Incorporated, in the Circuit Court of Louisa county, to recover damages for the death of her decedent by the wrongful act of the defendant company. The jury rendered a verdict in favor of the plaintiff for the sum of $5,000, upon which the court entered judgment, and the case is before us upon a writ of error.

The case was tried upon an amended declaration which contains six counts, and the defendant is described as the "Arminius Chemical Company, a corporation created by

34

and existing under the laws of the State of Virginia." The Arminius Chemical Company, Incorporated, appeared and craved oyer of the original writ, from which it appears that the sheriff of Louisa county was commanded to summon the "Arminius Chemical Company, a corporation created by and existing under the laws of the State of Virginia," and that it was executed by delivering a copy thereof to R. L. Gordon, Jr., the agent and attorney of the Arminius Chemical Company; whereupon the defendant company pleaded that R. L. Gordon, Jr., was not the attorney of the company named upon whom legal process could be served, but was the agent for the purpose of receiving service of process on the Arminius Chemical Company, Incorporated; that they were separate and distinct legal entities; that the West Virginia corporation, the Arminius Chemical Company, expired on the 9th day of January, 1907, when it conveyed by deed of that date all of its property in the State of Virginia to the Arminius Chemical Company, which was created a corporation under the laws of the State of Virginia on the 8th day of November, 1906, by the name of the Arminius Chemical Company, Incorporated.

The court rejected this plea and gave leave to the plaintiff to amend her declaration by inserting the word "Incorporated" after the word "Company"; and these two rulings of the court, refusing to allow the plea to be filed and permitting the plaintiff to amend her declaration, are the subjects of the first and second bills of exceptions.

We think the rulings of the court were plainly right. There was at the time of the institution of this suit but one company, which was the Arminius Chemical Company, Incorporated. It was the defendant in the suit; R. L. Gordon, Jr., was its attorney, duly appointed under the laws of the State to receive service of process on its behalf; it was served upon him, and the Arminius Chemical Company, Incorporated, was thereby brought before the court.

The defendant company also moved to quash the original writ in the case, because it was not made returnable in accordance with the law, in that it did not appear that it was made returnable within ninety days from its date.

The writ was issued on the 25th of November, 1908, and was made returnable to the rules to be holden "on the third Monday in January," to answer the administratrix of Richard S. White of a plea of trespass on the case; the objection being that the writ should have said, "on the third Monday in January, next."

We find no merit in this objection. Of course, it would have been better to have said "the third Monday in January, next," but the omission was immaterial. It could have misled no one who did not exercise some ingenuity to be deceived.

There was a demurrer to the declaration and to each count thereof. Upon examination we find that, while the counts in the declaration are more elaborate than needful, containing much which might safely have been rejected as surplusage, yet in each, if the material facts which are well pleaded are proven, the plaintiff would be entitled to a judgment. In other words, each count states a sufficient cause of action.

The several preliminary exceptions and the demurrer to the declaration are, therefore, overruled.

With respect to the instructions given on behalf of the defendant in error, we find no objection, if there be evidence tending to prove the facts upon which they are predicated; nor do we find reversible error in the action of the court refusing to give certain instructions asked for by the plaintiff in error.

This brings us to a consideration of the motion of the plaintiff in error to set aside the verdict as contrary to the evidence.

The defendant company is engaged in the mining of

pyrites, and employs about three hundred men. The shaft of the mine is sunk at an angle of thirty degrees from the perpendicular and sixty degrees from the horizontal. It is 1,060 feet deep, and from it at various depths levels are run off on either side from which the ore is ·taken. The ore is raised by a steam engine, by means of an ore car or skip. The car is moved by a wire cable attached to the bail of the car, the other end of the cable being attached to a large drum at the surface, which drum is connected by a clutch or cog-wheels which fit into the wheels on the engine. This connection is made by a lever, which is moved to the right to disconnect, and to the left to connect, by the turning of a wheel at the engineman's stand. When the drum is thus connected with the engine, the car cannot descend, and when it is desired to lower the car the drum is disconnected from the engine and it is lowered—or it would, perhaps, be more correct to say that the speed by which it is lowered is regulated by means of a brake on the drum. This brake may be operated by hand or by compressed air, by which pressure is brought to bear upon the drum. The setting of the brake by hand is effected by forcing a lever back and catching it in a clutch, by means of which it retains the pressure thus secured. The air when used has a pressure three times as great as that which can be secured by hand. The car runs upon a narrow-gauge steel track, and in order to facilitate the work there are two of these tracks, over each of which a car is moved, being attached to separate drums, but drawn up and lowered by the same engine. In the engine-room, immediately in front of the hoistman or engineman, there is a gauge upon which there are two hands, one red and one black, like those on the face of a clock, which indicate at all times the exact pressure of air upon the brake cylinder or brake, and the air pressure on the air reservoir, which is connected with the brake cylinder. This pressure can be

increased or decreased at the will of the operator.    There is an air brake for each drum and a gauge for each drum. Both drums are under the eye of the hoistman, and any movement of either can be instantly observed.    There is also a shaft indicator, consisting of a large dial, the hands on which point to the depth of the skip in the shaft from the top of the dump to the bottom of the shaft.    The air is turned on or off of the brake by a hand lever eight or ten inches long, which is moved easily by the operator, but is stationary unless moved by physical force.

The plaintiff's intestate was killed by falling from defendant's ore car or skip.    The hoistman testified that after he had landed the men from the north skip he turned to raise those on the south skip and saw the drum turning the wrong way and knew that the skip had escaped control; that he applied the air brake suddenly, turning the lever to emergency; that he did not know how it escaped control, but that he might have struck it inadvertently and knocked the air pressure off.

The lever referred to, by which the air is controlled, moves through a space of about six inches.    The point midway between the extremes of its movement is known as the center.    If the air is to be turned on, it is moved to the right.    Moved slowly, the air pressure is gradually generated; moved rapidly, the pressure upon the brake is correspondingly increased.    When it is moved from the center to the left, the air escapes and the pressure is correspondingly diminished.

As has been said, there are two skips, moving on two separate tracks, one known as the north skip and the other as the south skip.    The accident which is the subject out of which this suit grows took place about half-past five o'clock on the evening of October 7, 1908.    The north skip was at the 900-foot level; the south skip was at the 400-foot level.    A signal was given to the engineman of five bells

from the lower level, which indicated that the skip was to be drawn up with men upon it. The skip was an iron bucket, and the usual complement which each skip could bring up was twelve men—six in the bucket itself, one upon each of the corners (that is to say, four upon the edge), one upon the bail, and one upon the rope, making twelve in all. The north skip was brought safely to the surface, when the hoistman observed that the drum of the south skip was moving in a direction that indicated it was descending. Thereupon, he applied the air brake by moving it to the right, and the movement was so rapid and the action of the brake so violent that the car or skip was brought to a sudden stop and the men standing upon the edge or rim of the skip were thrown off and the plaintiff's intestate was killed.

Just how the occurrence took place is not shown by the evidence. The theory of the plaintiff is (1) that the machinery, especially the brake, was not reasonably safe, and (2) that the defendant had not exercised due care in the selection of a suitable hoistman, and had not exercised due care to see that he properly discharged his duties, and that upon the evening of the accident, especially as a result of an attack of pleurisy, the hoistman was not in a physical condition properly to discharge his duties.

The Arminius Company and its predecessors have been for a long time engaged in the business of mining pyrites. Machinery of various types has been in use. For a great while a brake operated by hand was used in regulating and controlling the movement of the ore cars or skips, but about two months before the accident a brake was installed which was controlled by air pressure. The proof shows that this machinery was obtained from and installed by a manufacturing company in good standing; that the machinery itself was in perfect order; and that a man skilled in its operation came to the mine when it was installed, put it into

position, and remained for two or three weeks instructing the hoistmen in its uses; that it was not a machine of great complexity, and that a man conversant with machinery of that general description could easily acquire the requisite skill safely to operate it.

It appears that Schmitz, who was the hoistman upon the occasion of the accident, had been engaged in that business for many years, and had shown himself to be a reliable and capable man.   He had received instruction at the time the new brake was installed and had operated it successfully. It does not appear that there had been any accident or any circumstance to indicate his incapacity or unfitness for the service required of him during the whole period of his connection with the company, during which, when the machine was equipped with hand brakes, the skip had been moved up and down, loaded most frequently with ore but numberless times with men, without any accident or occurrence which caused his co-employees to question his fitness or give to his employers any reason to suspect such to be the fact.

On Saturday, October 3, Schmitz went home.   On Sunday there was no work at the mines, and he went down to his brother-in-law's, at Buckner station, to pay a visit, returning on the midnight train Sunday night.   He did not go to work on Monday morning, because during that week he was on the night shift, and was due to go to work on Monday afternoon, but not feeling very well he did not go, and his condition at that time is thus described by him:

"The trouble bothering me has bothered me every time I catch cold in the last thirty-two years.   I was struck by a tree thirty-two years ago, and whenever I catch cold I have a pain in my breast.   I had broke in another hoistman, and I said I would stay at home.   I helped my wife shuck corn Monday, and I didn't go to work.   I sent a message to the mines that I was not coming down Monday night."

Tuesday evening Mr. Clearihue, who had charge of the mines, went to Schmitz's house, and, according to the statement of Schmitz and of Clearihue, the latter asked Schmitz how he was getting on, to which Schmitz replied that he was getting on fairly well. The manager then asked when he was going on. "I said I didn't feel like going that night; that I didn't want to go on until I felt like going, and he said, 'I don't want you to go on until you do feel like working.' " Wednesday about noon they sent a messenger to him again, a Mr. Kennedy, and Schmitz told him that he would come to work that evening; and it seems that, for reasons which need not be particularly stated, it was quite necessary to the running of the mine that he should be there that night. When Kennedy went to Schmitz's house he was accompanied by a man by the name of Thomas, and Thomas says that he heard the conversation between Schmitz and Kennedy, and that Schmitz said that he didn't feel much better; that his side still hurt him, but being urged, that Schmitz "agreed to go and do what he could." Another witness proved that on October 7, 1908, Schmitz stated to him that he was really not in a condition to go to work that night, but that he had been sent for and urged to come down; but this particular statement it seems was made after the accident. Other witnesses proved contradictory statements on the part of Schmitz as to his physical condition during Monday, Tuesday and Wednesday, as contradicting the statement which he made upon the stand, the substance of which has been given. It is to be observed that the contradictory statements made by Schmitz are not substantive evidence of the existence of the facts thus stated by him. He was put upon the witness stand by the defendant in error, and the only effect of the proof of contradictory statements is that it may counteract in the minds of the jury the hostile testimony which he had given to the surprise of the party calling him.

A Mr. Lewis P. Trice, who went to Schmitz's on Tuesday evening with Clearihue, the manager, gives this report of the conversation that occurred between Clearihue and Schmitz: "He wanted to know how Schmitz felt, and Schmitz told him he was not feeling very good, and if he did not feel any better, that he would not be able to come to work the next day. Mr. Clearihue told him he was very much in need of him, and would like for him to come as soon as possible, and he would do all that he could towards getting him the extra quarter in the day," which he said, in reply to question by a juror, meant extra pay.

This statement, for what it is worth, differs from other contradictory statements alleged to have been made by Schmitz as to his condition in this, that if made at all (and of this the jury, of course, were the judges) it was made in the presence of Clearihue, who occupied such a relation to the company as to make notice to him notice to the company.

We have the testimony of those who visited and met him in the interval between Saturday, the 3rd, and Wednesday evening of the 7th; we have the testimony of his wife, and that of Mr. Clearihue, to whom he reported on his return to work on Wednesday evening, and of one or more of his co-employees whom he met at that time, that they observed nothing to excite suspicion as to his condition and his fitness to perform the duties for which he was employed. He was examined by physicians after the accident occurred, and was then in a highly nervous state; but that surely is not to his discredit. That he was broken down at the thought that, however innocently, he had been in some degree connected with a horrible accident, resulting in the death of four human beings, was sufficient to unnerve any man of proper feeling. There was some effort to prove that he was drunk at the time, but it wholly failed. The physicians who made a very cursory examination say that they found him suffer-

ing from pleurisy, which extended over about four square inches of the surface of his left lung. The examination was superficial and was made after the accident, and while it may show that a prudent man would have remained at home, it does not tend to show any connection between his pleuritic condition and the accident, and is certainly not sufficient to bring home to the company such notice or knowledge of his condition as required it, in the exercise of reasonable care, to forbid his exercising his duties of hoistman.

It is said, however, that the air brake when left at center leaked; that the air gradually escaped and the pressure was thereby diminished, and the force of gravity set the skip in motion. The proof is that there would be an escape of air when the lever which controlled the air brake was at center; that air being very attenuated and volatile in its nature will escape when confined. A machine, we suppose, made so tight as to render the escape of air impossible would be incapable of operation; but the proof is, and there is no contradiction of the evidence upon this point, that the machine when properly operated is safe and adequate to the perfect control of the hoisting apparatus. The force of the brake can be applied slowly and the movement of the car will be gradually diminished; if applied rapidly, the force of the brake is such that the movement is suddenly stopped. All then depends upon the method of operation, and in the case before us the hoistman, finding the car descending, it already having fallen about thirty-one feet, and knowing, of course, that as it moved its descent would be accelerated, found himself in the presence of a sudden emergency. From center to the extreme right is only three inches, and in moving the lever from center to the right, where the extreme of movement was only three inches, he moved it so far as to bring to bear a pressure upon the brake which brought the car to a sudden stop.

But it is contended that the movement began as the result of the leakage of the air; that the leakage of air was an inherent quality which could not be overcome, and that it was improper to rely upon the air brake while the bucket or skip was swinging in the shaft, and in doing so the hoist- ·man was violating the express directions of his instructor and had done so so continuously and habitually that the Arminius Company knew, or ought to have known, of his conduct and taken steps to apply a remedy.

We do not so read the evidence. Turning first to the evidence of Schmitz, who was a witness of the defendant in error, he says, speaking of the evening the accident occurred: "The first thing I did was to pull the north skip from the 800-foot level, which was our rule generally to pull the men down below first; we always took the men in the lowest part first. When I got that skip to the top and landed it, I turned around to take the south skip up, and found it going down, and my first thought was to put the emergency on to save those men, and when it stopped it threw those men off. I don't know what caused it to move; when I first saw it, it was going at a pretty good speed." With reference to the use of the hand brake, he says: "We wasn't in the habit of using the hand brake, only when we stopped over Sunday or over night we put that on for a lock. . . . I did not use the hand brake on this occasion to hold the south skip suspended in the shaft; I used the air brake because the air brake was safer and easier to put on."

Hester, also a witness for the defendant in error and one of the principal hoistmen or engineers, testified upon the subject of the air brake as follows:

"Q. Now after the new machinery was installed, and up to October 7, 1908, did you use the air brake alone when handling men to hold the skips suspended in the shaft? A. Yes, sir, I used the air brake.

"Q. I mean, did you use the air brake in handling the

men? When you were going to hold a skip suspended in the shaft with men on it, and you had to wait some considerable time, did you rely on the air brake to hold the skip? A. Well, most of the time; of course, I used the lever also whenever I left the engine any time.

"Q. You did not use the lever except when you left the engine? A. No, sir—well, yes, sir, sometimes when I was standing by the engine I used it, pulled the lever in.

"Q. You did do that? A. Yes, sir, I did.

"Q. In your position there as hoister? A. Yes, sir, I did.

"Q. You did do that often? A. Mighty near every time when I had occasion for swinging in the shaft.

"Q. You did that nearly every time? A. Yes, sir.

"Q. Why did you do that? A. Because I thought it was best."

This witness, it will be remembered, was on duty immediately before Schmitz, and he testified, in addition to what has already been quoted, that when he left the engine and Schmitz took his place it was in good order, working properly, and there was no difficulty in controlling the air brake whatever; that he had observed no leaks or escape of air; and that when he came back after the accident he found everything all right, just as he left it; that he used the air brake after he returned and it worked properly.

Mr. Harper, who installed the machinery and gave instructions as to its use, says:

"Q. Now, Mr. Harper, the engine is used to raise everything there, and the air only is used in practice as a brake? A. Yes, sir.

"Q. Or to control or retard motion; that is what a brake is intended for, isn't it? A. Yes, sir, that is what a brake is intended for. I will further state that in connection with these air brakes there are two auxiliary hand brakes that they use in case that they shut down over Sunday, or let the cages stand without any steam on the pumps, and they

want to keep the engines from moving; they put the hand brakes on them. . . .

"I did not recommend the use of the hand brake in getting out ore, because it is slower naturally and more laborious. A man has to get out of his position somewhat to handle it. It has a long leverage, and it takes considerable effort to pull it. In order to get out the product more rapidly, the air brake is quicker and more sure and requires less effort on their part; so I recommended the air brake altogether; I only recommended the use of the hand brake when they were shutting down and had no air, and only as an auxiliary of safety to the air brake.

"Q. Now, when the engine was in operation and the man was actively engaged in the work of the mine, which brake would he use under your instructions chiefly? A. The air brake."

It is plain from this that Schmitz correctly understood and applied the instructions which he had received. The hand brakes were auxiliary, not to the regular use of the machine in active operation, but when the mines were shut down on Sundays, or when the cages were left standing without any steam on the pumps and they wanted to keep the engines from moving. "I only," said Harper, "recommended the use of the hand brake when they were shutting down and had no air, and only as an auxiliary of safety to the air brake."

On the occasion in question, none of these conditions existed. They were in active and constant operation; there was steam on the pumps; and they had abundance of air, as was illustrated when by accident or otherwise the lever was moved to the right and the air turned in full force upon the brake. We have searched and searched in vain for any evidence that there was any increased danger in the operation of the air brakes over and above that which pertained to the operation of the machinery in use at the mines

prior to the installation of the air brakes; on the contrary, the air brakes are more powerful, more efficient and more easily controlled than the hand brakes.

Leaving out of view for the moment responsibility for the beginning of the downward movement of the car, the situation called for prompt action. According to Harper, the use of the hand brake is slower and more laborious. "A man has to get out of his position somewhat to handle it." Under such conditions, the almost instinctive act in such an emergency was to apply the force most easily within reach. Had he waited to get out of his position in order to use the hand brake, the disaster might have been still more appalling.

There are some minor circumstances proved by the evidence, introduced for the purpose of showing the unfitness of Schmitz, the hoistman, for his duties, but which we do not regard as at all material. For instance, that while the south skip was waiting at the 400-foot level it was suddenly run up a few feet, and then allowed to come back, that the usual habit was to bring the skip from the lower level up to a level with the upper skip, and then draw them both up to the surface together, which was not done upon the occasion in question; that the skips upon being drawn up were sometimes carried above the surface for a considerable distance—ten or twelve feet. From all of which the argument as to the unfitness of Schmitz is deduced, but which to us seem to be altogether trivial and of no probative value; and it is possible we have omitted to mention other circumstances of a like character.

After the case had been submitted to the jury, they came into court and propounded the following question: "If we should believe from the evidence that Mr. Harper, the man who installed the machinery, fully instructed the hoistman, Mr. Schmitz, in the manner and mode of using said machinery, but the said Schmitz was negligent in not carry-

ing out the instructions, and the defendant was negligent in not seeing that they were carried out, then would the law under such state of facts allow us to find for the plaintiff?"    In answer to this query the court said: "Yes, provided you believe the other propositions of fact contained in instruction No. 4."

Now instruction No. 4 is predicated upon the idea that the use of brakes operated by compressed air was more hazardous than the use of the hand levers; that this was known to the defendant, or could have been known had it used ordinary care and skill in supervision; that it gave no notice or warning of any increased danger; that the same .was unknown to the plaintiff's intestate, and was not obvious to him; that it was the duty of the Arminius Company to have made some proper order or regulation which would have required its hoistman operating the machinery to use the hand levers for stopping the skip; and that the accident was due to the failure of the defendant to give such order or to make such regulation and to see that the same was obeyed and carried out.

The defendant in error, in reference to what passed between the jury and the court, as above detailed, says: "Here is the very gist of the case and the ground on which the verdict was based, namely, the concurring negligence of the hoistman fellow-servant and of the defendant itself, which was the proximate cause of the intestate's death."

If we are correct in the conclusion we have reached, that there was no greater danger in the use of the air brake than of the hand brake, then the facts did not exist upon which instruction No. 4 was predicated, and the whole theory of the case upon which defendant in error relied, falls to the ground.

Upon the whole case we are of opinion that the verdict should have been set aside, and a new trial awarded, and this court will enter such judgment as the circuit court ought to have rendered.                                   *Reversed.*